**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|        ) | |
|     v.       ) | CR. NO. 03-10404-NG |
|        ) | |
| MICHAEL S. GRIFFIN,     ) | |
|     Defendant.     ) | |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS
### May 17, 2006

## I.   INTRODUCTION

Defendant Michael Griffin ("Griffin") was arrested on October 28, 2003, for allegedly transporting drugs from Texas to Massachusetts.  Defendant now moves to suppress evidence collected during the arrest, including statements he made while being questioned, $15,000 in cash taken from a safe in his basement, and $5,000 in cash and some prescription pain pills removed from a briefcase in his car.[1]  Griffin claims that the Miranda warnings given by police officers were impermissibly undermined by other police remarks and that he never consented to the searches of his safe and briefcase.  For the reasons articulated below, I hereby **DENY** the motion to suppress the statements made by Griffin (#102) and **GRANT** the motion to suppress the $15,000 in cash.  The government has chosen not to

---

[1] The government contends that the $5,000 and the pills were actually taken from Griffin, but I decline to make a ruling on this factual dispute in light of the government's position.

offer the $5,000 and the pills in its case-in-chief on relevance
grounds.

## II.  **FACTS**

On the morning of October 23, 2003, Detective Thomas Kennedy
of the Alexandria Police Department and two members of the
Massachusetts State Police arrived at defendant's residence in
Newton, Massachusetts to arrest him.[2]  Defendant's son answered
the door and defendant's wife allowed the officers – masquerading
as customers of defendant's business – into the house.  After
being invited in, the officers dropped their cover as business
acquaintances of defendant and informed Ms. Griffin that they
were actually police officers.

The officers told Ms. Griffin to summon her husband from
upstairs, which she did, informing him only that there were men
there to see him.  Griffin, believing that the men were customers
of his moving business, joined his wife and the officers in his
living room at which time the officers revealed their true
identities.  The officers then placed Griffin under arrest and
told him that his home, car, and trucks were being seized.  In
defendant's account, Detective Kennedy and another officer then

---

[2] A warrant for defendant's arrest had been issued in the Eastern
District of Virginia five days earlier.  The case was transferred to
Massachusetts pursuant to Rule 21.

handcuffed him, searched his various pockets, and removed his belt and shoelaces.[3]

After handcuffing the defendant the officers led him into the diningroom, seated him at the table, and began to read him his Miranda rights.  Defendant's wife was present in the room at the start of this questioning, but was removed from the room by one of the officers because she continued to interrupt Detective Kennedy's attempt to read the Miranda warning.[4]

When defendant's wife left the room, Detective Kennedy repeated the Miranda warning and Griffin acknowledged that he understood the recitation.  According to Griffin, Detective Kennedy then stated, "Be honest with us.  You get from us what we get from you." (Suppr. Hr'g Tr. 74, Mar. 27, 2006).  Griffin also contends that the detective made a similar remark before issuing the Miranda warning.  Detective Kennedy disputes making either statement, but has admitted that he told defendant it was in his best interest to cooperate and tell the truth.  (Suppr. Hr'g Tr. 56-57, Mar. 8, 2006).

---

[3] Defendant's wife provided a similar account.  (Suppr. Hr'g Tr. at 9, Mar. 27, 2006).  Detective Kennedy claims that he has no recollection of patting down defendant at this time, though he admitted that patting down the defendant would be "standard practice" and stated, "I would like to think I did a patdown, yes, for my own safety, but I can't specifically remember patting him down."  (Suppr. Hr'g Tr. at 47-48, Mar. 8, 2006).

[4] Despite being removed from the room, defendant's wife remained in visual contact with her husband and within easy earshot of the subsequent questioning.

While the exact content of the detective's remarks is
unclear, after receiving the Miranda warning, Griffin then
proceeded to discuss the drug allegations with Detective Kennedy.
Accounts of this exchange also diverge sharply,[5] but both parties
agree that the discussion involved defendant's alleged drug-
transporting trips to Texas and the sum of money he allegedly
received from the trips.

Towards the end of the conversation, Detective Kennedy
accused Griffin of having received $560,000 for transporting
drugs.  Here again, the two accounts part ways.  Detective
Kennedy testified that he asked Griffin if he had any of the
money remaining, and Griffin replied that he had some in his
basement safe.  (Suppr. Hr'g Tr. at 28, Mar. 8, 2006).  According
to Griffin, Detective Kennedy never asked him if he had any drug
money remaining, but asked only if he had cash in the house.[6]

---

[5] Detective Kennedy claims that Griffin ultimately admitted to making at
least twelve trips transporting drugs from Texas to Massachusetts; Griffin
claims that he admitted only having made four to six trips to Texas and denies
having admitted any knowledge of the contents of the packages he transported.
The two sides also disagree about the contents of their discussion regarding
Griffin's payment for the trips.  Detective Kennedy asserts that Griffin
admitted the $560,000 figure alleged by officers must be true if reflected in
the records possessed by police, while both defendant and his wife report that
Griffin rejected Detective Kennedy's assertions and that he told the Detective
he made a much smaller sum of money, probably between $30,000-$60,000.

[6] The testimony given by Griffin's wife is consistent with his
testimony:

> A. Detective Kennedy asked Michael [Griffin] if there was any cash
> in the house.  'Do you have any drug money in the house,' and
> Michael said, 'I don't know what you're talking about.'  He goes,
> 'I have cash in the house in the safe from when we refinanced the
> house, but I don't know what you're talking about.  I don't have
> any drug money. . .'

(Suppr. Hr'g Tr. at 53-54, Mar. 27, 2006).  Griffin then informed
the officers that he had $15,000 remaining from a home equity
loan, stored in a safe in his basement.

Detective Kennedy ordered Griffin to surrender the money,
saying, "You're going to take me to the safe."[7]  (Suppr. Hr'g Tr.
at 54, Mar. 27, 2006). Griffin, handcuffed, and accompanied by
two of the officers, went to the safe as directed.[8]  Upon
arriving at the safe, Detective Kennedy commanded Griffin: "Give
me the combination to the safe," and Griffin complied.[9]  (Suppr.
Hr'g Tr. at 55, Mar. 27, 2006).  Detective Kennedy opened the
safe and searched it, seizing the $15,000 described by Griffin.

Some time later,[10] the two officers in the basement escorted
Griffin back upstairs where $5,000 and some prescription
painkillers were taken from him under disputed circumstances.
According to the government, both the cash and the pills were

---

(Suppr. Hr'g Tr. at 16, Mar. 27, 2006).

[7] The Court accepts this testimony, given by Ms. Griffin, both because of her credibility on the stand and because it is substantially corroborated by Detective Kennedy's account: "I informed him I needed to get it from him before we left."  (Suppr. Hr'g Tr. at 28-29, Mar. 8, 2006).

[8] Griffin and his wife assert that the officers used force to escort Griffin to the basement.  According to their account, Griffin was dragged to his feet and forcefully pushed to the safe while still handcuffed.  Detective Kennedy claims that he did not use any physical force, but whether overt force was used or not, the impact was the same: Griffin did not believe he had any choice but to acquiesce to the officers' demands.

[9] In Detective Kennedy's account, he offered a similar version, explaining, "I said what's the combination?"  (Suppr. Hr'g Tr. at 30, Mar. 8, 2006).

[10] The parties disagree as to whether this was 5-7 minutes later or roughly 20 minutes later.

removed from the pockets of Griffin's pants during a routine
search to prepare the defendant to be taken into custody.[11]
According to Griffin, the officers asked him about the location
of his driver's license before he was taken into custody.
Griffin informed them that the driver's license was in his
wallet, which was located in a briefcase under the seat of his
car.  The officers then removed the briefcase from the car,
extracted the wallet and license, and searched the bag,
uncovering the $5,000 and prescription pills.  As with the money
in the safe, none of the officers requested permission to
retrieve or search the briefcase.

III. **ANALYSIS**

    A.   **The Statements**

Defendant has moved to suppress all of the statements he
made at the time of his arrest relating to the alleged drug
activity.  In support of this request, defendant argues that
Detective Kennedy's alleged statement, "You get from us what we
get from you," undermined the Miranda warning that immediately
preceded it.  According to defendant's brief, this statement had
two effects.  Def. Mem at 5.  First, defendant contends that it
undermined the warning that any statement he made could later be
used against him, replacing it with the suggestion that he needed

_____

[11] This position is also in conflict with Griffin's earlier assertion
that the police searched his pockets upon arrest, an action that Detective
Kennedy claims he cannot recall.  See _supra_ note 4.

to cooperate in order to get fair treatment.  Id.  Second,

defendant argues that this statement put "extraordinary pressure"

on him.  Id.

These arguments are not borne out by defendant's testimony

at the suppression hearing.  At the suppression hearing, the

attorney for the government asked Griffin about Detective

Kennedy's alleged remarks:

> Q: "When I hear the phrase, 'You'll get from us what we
> get from you,' it doesn't have any obvious meaning to
> me.  Did it have an obvious meaning to you?
> A: It did.
> Q: And did you understand Detective Kennedy to be
> threatening you?
> A: I just took Detective Kennedy of asking me to be
> honest with him.
> Q: All right.  And did that frighten you in some way?
> A: No.
> Q: And did you understand him to be telling you that
> there was going to be some even worse consequence if
> you didn't talk to him?
> A: No.

(Suppr. Hr'g Tr. at 74-75, Mar. 27, 2006).  The government

attorney then asked Griffin:

> Q: You knew you had a right to remain silent?
> A: Yes.
> Q: You knew you had a right to counsel?
> A: Yes.
> Q: You knew that anything you said could be used
> against you in court?
> Q: Yes.

Contrary to the assertions made in defendant's brief,

defendant testified that he did not feel threatened by the

alleged remarks, was not frightened by them, and did not believe

that adverse consequences would result from his silence.

Moreover, defendant stated that he was aware that anything he said could be used against him in court.  As such, it is hard to credit the assertions made in defendant's brief about "extraordinary pressure" or defendant's perceived need to cooperate in order to get fair treatment.

The First Circuit has explained that a defendant may waive his Miranda rights as long as the waiver is made voluntarily, knowingly, and intelligently.  United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).  "To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, including 'the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne.'" Id. (internal citation omitted) (quoting United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987)).  The Court must presume that a defendant has not waived his rights, but the government may prove waiver by a preponderance of the evidence.  Id.

In the present case, the defendant received his Miranda warning, acknowledged that he understood the warning, and chose to speak to the police despite knowing he had a right to remain silent.  He does not claim to have been under the influence of any substance that would impair his ability to consent, was not threatened by the police, either subjectively or objectively, and was not subjected to extended interrogation.  For evidence of

coercion, Griffin relies primarily on the statement "You'll get from us what we get from you."  Because this statement has no obviously coercive element to it and because Griffin understood it to mean only that he should be honest with the officers, I find that defendant's waiver was made voluntarily.  As such, I will not suppress the statements made by Griffin to the police.

**B.   The Money**

Defendant has also moved to suppress the $15,000 seized by police from his basement safe because he did not consent to the search and there was no other justification for the warrantless seizure.  The officers admit they did not have a search warrant, and the seizure of the money on a different floor, in the safe, cannot be construed as incident to defendant's arrest.  Rather, the government argues that Griffin consented to the search.  I disagree.

Although I found that Griffin had voluntarily waived his Miranda rights before the search of the safe in the previous section, that obviously was not a blanket waiver of other constitutional rights.  It did not entitle the officers to go anywhere in his **home** or look at anything it wanted.  It surely did not entitle the officers to order Griffin to find the safe, to give them the combination, to order him, in effect, to waive

his Fourth Amendment rights.[12]  As both an empirical matter and a legal matter, the Miranda rights waiver and the consent search waiver, are distinct and separable events.  I find that the defendant did not consent to the search of his safe at all, and surely did not give a voluntary consent.

Warrantless searches are per se unreasonable under the Fourth Amendment unless the government can show that the search falls within one of the carefully defined sets of exceptions. Katz v. United States, 389 U.S. 347, 357 (1967); Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Chambers v. Maroney, 399 U.S. 42, 51 (1970); Unites States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999).  One of the established exceptions to the warrant requirement is a search that is conducted pursuant to an individual's valid consent.  United States v. Matlock, 415 U.S. 164 (1974); Schneckloth v. Bustamonte, 412 U.S. 218 (1973); Unites States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); United States v. Twomley, 884 F.2d 46 (1st Cir. 1989).  Because the favored practice is a search pursuant to a warrant, and waivers are disfavored, the government has the burden of proving a valid, voluntary consent by a preponderance of the evidence. See United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006).

---

[12] See 2 W. Lafave, Criminal Procedure, § 3.10 (2d ed. 1999) ("It is not inconsistent with Thomas to say that the giving of Miranda warnings may contribute to a finding of voluntariness, but the Miranda warnings are not equivalent to Fourth Amendment warnings in terms of overcoming prior coercion, for a frightened and confused defendant might well not suspect that the Miranda-type warning is equally applicable to a search).

Whether or not the government has established that consent
was given voluntarily is a question of fact that turns on the
totality of the circumstances.  U.S. v. Genao, 281 F.3d 305, 309
(1st Cir. 2002); see also Schneckloth v. Bustamonte, 412 U.S.
218, 227 (1973).  Relevant circumstances include "age, education,
experience, intelligence, and knowledge of the right to withhold
consent."  United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)
(quoting United States v. Barnette, 989 F.2d 546, 554-55 (1st
Cir. 1993).  The Court should also consider "whether the
consenting party was advised of his or her constitutional rights
and whether permission to search was obtained by coercive means
or under inherently coercive circumstances."  Id. at 555.
Moreover, "[s]ensitivity to the heightened possibility of
coercion is appropriate when a defendant's consent is obtained
during custody," United States v. Trueber, 238 F.3d 79, 95 (1st
Cir. 2001) (citation omitted), because "[c]onsent must be a
product of [the] individual's free and unconstrained choice,
rather than mere acquiescence to authority."  U.S. v. Pena, 914
F. Supp. 1239, 1250 (D. Mass. 1996) (quoting United States v.
Wilson, 11 F.3d 346, 351 (2d Cir. 1993)).

When the defendant was read his Miranda rights, he was
presented with a list of specifically articulated rights.  He
knew that he could remain silent, and has since testified that he
understood the rights he was relinquishing.  He was presented

with an actual choice and made a reasoned decision.  But he surely was not providing the police with some sort of all-access pass to any potential evidence or information in his possession. He was never informed of his right to refuse the officer's order. The defendant, quite simply, waived the limited set of rights articulated by the officers.  No more and no less.

To be sure, the fact that Griffin had participated in the formal Miranda waiver process with respect to his Fifth Amendment self-incrimination rights may bear on the voluntariness of the subsequent waiver of Fourth Amendment rights.  But it is not -- and cannot be -- dispositive.  Otherwise, a defendant would be put in jeopardy of surrendering rights that he did not intend to, and would never voluntarily do.  Such a situation would make a mockery of the "voluntary consent" exception to the Fourth Amendment.  Indeed, the circumstances of the Miranda waiver could well point against consent to search in this case.  While there is no general obligation to warn a citizen about the right to refuse a Fourth Amendment waiver -- nothing like a Miranda litany -- there may well be circumstances in which a defendant confuses one waiver with the other.  Griffin may well have believed that once the door was opened to access to his statements, he could not refuse access to his home.[13]

---

[13] See supra note 12.

But my ruling does not rest simply on Griffin's confusion about his rights.  This case involves much more than mere confusion: the officers not only avoided telling Griffin he had a right to refuse consent, the officers made the opposite clear -- that Griffin had *no* choice but to consent.  By couching their search request/demand in the same hortatory language that officers use to issue orders that clearly require no consent (the pat down frisk, the handcuffing) the police communicated that Griffin had no reasonable alternative but to acquiesce.  This situation is fundamentally coercive in a way that was not true of defendant's Miranda waiver.  With respect to his Miranda rights, Griffin expressly knew he could refuse the police questioning.  With respect to his Fourth Amendment rights, Griffin concluded, based on what the officers said and did, and the totality of circumstances, that he could not.

On the day of his arrest, the defendant, who had previously never been arrested, was placed in custody in front of his wife and young son who was home sick from school.[14]  He was handcuffed and then questioned by police while his wife shouted hysterically at him, eventually requiring officers to escort her to an adjacent room.  He waived his Miranda rights arguably to give the government what, according to his account, was an exculpatory

---

[14] Griffin's son left the room before the interrogation of his father began.

statement.  It is not difficult to imagine that he made an informed choice to speak to the officers, but may have made a very different choice about subsequent searches *had he been given the option to do so.*

Significantly, he was never given that option.  After the interrogation, the police ordered Griffin to show them the location of the safe.  He was directed to lead officers to the safe and then forced down the stairs to the basement.  Upon arriving at the safe, Griffin was commanded to open it.  There is no indication that he understood he had a right to stop this train -- the officers' intrusion into his home, and then into his safe -- once ordered to continue.

Rather, he acquiesced to an order from an arresting officer, much as he acquiesced when the arresting officers patted him down, placed him in handcuffs, and ultimately led him into custody.  Refusal to disobey a direct police order -- especially for an individual uninitiated to the criminal enforcement process -- can hardly constitute consent.

Even if Griffin's lack of resistance were viewed as some sort of tacit consent, it can hardly be viewed as voluntary.[15] While a defendant's custody always warrants a sensitivity to the

---

[15] "Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, such knowledge [is] highly relevant to the determination that there had been consent."  United States v. Mendenhall, 446 U.S. 544, 558-59 (1980).

heightened possibility of coercion, this possibility is magnified in the current situation because of defendant's unfamiliarity with the criminal justice system, stressful family situation, the presence of three armed officers in his home, and the statements of the officers which amounted to orders, not requests.  Given these facts, defendant's actions cannot possibly be viewed as voluntary.

I hereby grant defendant's motion to suppress, insofar as it applies to the $15,000 from the safe.

**IV.   CONCLUSION**

For the reasons cited above, I hereby **DENY IN PART** and **GRANT IN PART** the motion to suppress.  I **DENY** the motion insofar as it applies to the statements made by defendant and **GRANT** the motion insofar as it applies to the $15,000 seized by the arresting officers.


**SO ORDERED.**


**Dated:     May 17, 2006          /s/ NANCY GERTNER, U.S.D.J.**