UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
                                  )
                                  )
     v.                           )
                                  )    No. 03-10404-NG
1. MICHAEL GRIFFIN,               )
2. RONALD CAVALIERE,              )
3. WILLIAM DAVID VENEY, and       )
4. RICHARD COLLADO,               )
                                  )
          Defendants.             )


**GOVERNMENT'S MOTION IN LIMINE TO ADMIT**
**STATEMENTS MADE ON OCTOBER 28, 2003, BY CHRISTINA GRIFFIN**

The government hereby moves in limine for an order allowing
it to introduce in evidence various statements made by Christina
Griffin on October 28, 2003, at the time of Michael Griffin's
("Griffin") arrest.  This evidence is relevant and falls within a
firmly rooted exception to the hearsay rule.  The jury should
therefore be entitled to hear it.

**A.    Michael Griffin's arrest on October 28, 2003; Christina
       Griffin's reaction.**

Griffin was arrested at his home by Detective Thomas Kennedy
of the Alexandria, Virginia police department, Trooper Tim Babbin
of the Massachusetts State Police ("MSP"), and Trooper Michael
Smith, also from the MSP.  See Amended Memorandum and Order re:
Motion to Suppress (docket no. 124) ("Am. Mem.") at 2-3.
Griffin's wife, Christina Griffin, was present at the time of his
arrest and stayed with him until she was removed from the room by

Trooper Babbin.  Id. at 3.

Christina Griffin was taken from the room because she was
interrupting Detective Kennedy's recitation of the Miranda
warnings to Griffin, id., and because she was upset, angry, and
emotional.  See 3/8/06 Tr.52 (Det. Kennedy: "She was getting more
angry at her husband stating she couldn't believe he did this for
[sic] the family, she thought he was bringing back artifacts on
these trips.  She was very, very upset, and we couldn't finish
our job [of giving Miranda warnings], and she was just getting
very emotional[...].").[1]  There is no dispute that Mrs. Griffin
was in a state of emotional agitation, and that her ire was
directed at Griffin.  On direct examination, Mrs. Griffin
testified that she was "kind of just in shock" [3/27/06 Tr.7] and
that she was "so shocked and confused about what was going on,"
[id. 10].  Mrs. Griffin described the scene as Detective Kennedy
was attempting to read Griffin his Miranda rights:

> He started trying to read from the card to
> Michael, but as he was trying to read from
> the card, Michael, I was talking to Michael
> like, you know, "What the hell's going on?
> What is he talking about? Who's Frank?"

---

[1] Detective Kennedy's memory is that Mrs. Griffin spoke of
"artifacts."  As her testimony evidences, Mrs. Griffin recalls
questioning Griffin about "china and pottery."  The two are not,
of course, mutually exclusive, and the fact that both witnesses
independently recall Mrs. Griffin saying something of this nature
is further indicia of the fact that the statement was, indeed,
made.  The government will offer its evidence through Detective
Kennedy, who will describe his recollection that the question
involved artifacts.

> Michael is trying to go, "I don't know what's
> going on, Tina, I don't know what's going
> on," and half listening and everything, and
> then Detective Kennedy told me to shut up,
> and I looked at him, and I said, "Don't tell
> me to shut up, I have a right to ask my
> husband questions if I want to, I want to
> know what's going on," and then he told
> Trooper Babbin to get her out of there.

3/27/06 Tr.12.  Detective Kennedy also recalled Mrs. Griffin's

exclamations as interfering with his advising Griffin of his

Miranda rights: "At that point Mrs. Griffin was really becoming

agitated to the point where I had to stop, and I asked her to

please stop interjecting because it was very important that he

understand what I'm telling him." [3/8/06 Tr.22].

Mrs. Griffin had never before seen her husband get arrested.

[3/27/06 Tr. 25-26].  She agreed that the experience was "a big

surprise" and "pretty shocking" to her, and that nothing like

this had ever happened to her before. [Id. 30].  She agreed that

she was "pretty upset" at the time of the arrest, and that she

had "a lot of questions that [she] wanted answered," which she

was directing at Griffin.  [Id. 31].  Even after Trooper Babbin

had escorted her from the room, Mrs. Griffin was still in a state

of disbelief: "I was like, I just kept saying, 'I can't believe

this is happening, I don't know what's going on,' you know, stuff

like that." [3/27/06 Tr.37].  Although Mrs. Griffin characterized

herself as "not usually a type of person that panics," she agreed

that her husband's arrest was not " a usual situation." [3/27/06

Tr.38].  "I wanted to find out if my husband was lying to me,"
she said, "I didn't really care what they [the police officers]
were saying.  I wanted to hear what he was saying because at that
point I had no idea." [Id.]

Trooper Babbin is expected to testify, consistent with the
testimony of Detective Kennedy and Mrs. Griffin at the
suppression hearing, that he left the dining room (where Griffin
was being interviewed) with Mrs. Griffin.  He is further expected
to testify that, within a few minutes of the officers' entry into
the house, Mrs. Griffin said to Griffin, "You said you were done
with this."

**B.    After Crawford, a two-part analysis is required: were the statements excited utterances, and are they testimonial?**

Rule 803(2) creates a hearsay exception for "statement[s]
relating to a startling event or condition made while the
declarant was under the stress of excitement caused by the event
or condition."  Fed.R.Evid. 803(2).  The "excited utterance"
exception is a firmly-rooted exception to the hearsay rule.
Puleio v. Vose, 830 F.2d 1197, 1206 (1st Cir. 1987).

Its rationale is that "excitement suspends the declarant's
powers of reflection and fabrication, consequently minimizing the
possibility that the utterance will be influenced by self
interest and therefore rendered unreliable."  United States v.
Brown, 254 F.3d 454, 458 (3d Cir. 2001), cert. denied, 535 U.S.
944 (2002); see also United States v. Joy, 192 F.3d 761, 766 (7th

Cir. 1999).

After <u>Crawford</u>, as before, the analysis of whether a
particular statement is admissible as an excited utterance is
intensely fact-bound.  After <u>Crawford</u>, however, that analysis
must also include an assessment of whether that case's injunction
against "testimonial hearsay" bars the statements at issue.  <u>See</u>
<u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

In <u>Crawford</u>, the Supreme Court ruled that "testimonial"
statements were not admissible because they violated the Sixth
Amendment's requirements.  <u>Id</u>.  The Court identified certain
types of statements that were within the "core class" of
testimonial statements.  The first of these is

> in-court testimony or its functional
> equivalent -- that is, material such as
> affidavits, custodial examinations, prior
> testimony that the defendant was unable to
> cross-examine, or similar pretrial statements
> that declarants would reasonably expect to be
> used prosecutorially.   The second
> encompasses "extrajudicial statements . . .
> contained in formalized testimonial
> materials, such as affidavits, depositions,
> prior testimony, or confessions."  The third
> encompasses "statements that were made under
> circumstances which would lead an objective
> witness reasonably to believe that the
> statement would be available for later use at
> trial."

<u>United States v. Brito</u>, 427 F.3d 53, 59(1st Cir. 2005)
(describing <u>Crawford</u>; internal citations omitted).

<u>Brito</u> affords a useful parallel.  That case considered the
admission at trial (pre-<u>Crawford</u>) of an anonymous 911 call that

gave a description of a man with a gun.  The description was

provided to officers who arrested the defendant, and was

consistent with the defendant's physical appearance.  The 911

call was admitted as an excited utterance, and the defendant

challenged under Crawford.  Brito, 427 F.3d at 59-60.

The First Circuit carefully considered the nature of 911

calls, including the fact that they are made to the police and

are known to be preserved for potential use at trial.  Id.  After

acknowledging that many courts appear to stop there in their

analysis of 911 calls under Crawford, id. at 60, the Court of

Appeals went on to consider the nature of the call itself.[2]

"Although the call provided a detailed report of criminal

activity (including a description of the suspect and information

as to his whereabouts), there is more to the story.  The district

court supportably found that the call qualified as an excited

utterance.  In this instance, that fact makes a dispositive

difference."  Id.

In this Circuit, the court went on to decide, the two

---

[2] In Brito, the First Circuit charted a course through what
it described as "three camps" of post-Crawford decisions on 911
calls.  Id. at 90.  Stripped to their bones, these three camps
can be classified as follows: 1.  Excited utterances are never
testimonial hearsay; 2. Forget about whether it's "excited" --
what were the speaker's "objectively reasonable expectations" as
to how the call would be used; and 3. The Crawford and excited
utterance analyses are "distinct but symbiotic" and require case-
by case assessment.  Id. at 60-61 (collecting cases).  It
selected the third course, as explained above.

inquiries (into excited utterance and testimonial nature) are
"separate, but related."  "The excited utterance inquiry focuses
on whether the declarant was under the stress of a startling
event.  The testimonial hearsay inquiry focuses on whether a
reasonable declarant, similarly situated (that is, excited by the
stress of a startling event), would have had the capacity to
appreciate the legal ramifications of her statement."  Id. at 61.
The "excited utterance" inquiry comes first.  Id.

> **1.    Mrs. Griffin's statements, "You said you were done with
> this" and her claim that Griffin told her he was
> transporting artifacts are excited utterances.**

These two spontaneous statements by Mrs. Griffin are
admissible as excited utterances under Fed. R. Evid 803(2).  In
analyzing whether a statement is an excited utterance, there are
some common factors that most courts consider: (1) the
characteristics of the event, (2) the subject matter of the
statement, and (3) the declarant's age, motive to lie and
physical and mental condition.  See United States v. Marrowbone,
211 F.3d 452, 454-55 (8th Cir. 2000).

These requirements have been satisfied here, and the two
statements qualify as excited utterances.  Mrs. Griffin was under
a type of stress that she had never before experienced.  She was,
in her own words, "shocked and confused." [3/27/06 Tr.10].  She
was "pretty upset" and had "a lot of questions" for her husband.
[Id. 31].  As Mrs. Griffin said, she "[couldn't] believe this

[wa]s happening" [3/27/06 Tr.37] and "wanted to find out if [her] husband was lying to [her]." [Id. 38]  As all parties present agreed, she was so shocked and angry that she interfered with the police, interfering with their ability to advise her husband of his Miranda rights.  According to Mrs. Griffin, "I didn't really care what they [the police officers] were saying.  I wanted to hear what he was saying because at that point I had no idea." [Id.]

The subject matter of her statements was directly related to the "exciting" event (Griffin's arrest).  In the statement recalled by Trooper Babbin ("You said you were done with this"), Mrs. Griffin directly accused Griffin of not being "done" with "this" (presumably drugs).  Her comment was a reaction to the arrival of police officers at her home to arrest her husband on drug charges.  The other accusation she made to him (that he had represented to her that he was moving artifacts) was similarly tied to, and prompted by, the arrival of the police and his arrest.

As to the other factors (age, motive to lie, and physical and mental condition), none of those poses a roadblock to these statements' admission.  Mrs. Griffin is an adult woman who was not suffering from any mental or physical disability at the time of the statements.  She had no motive to lie: the police had arrested her husband, not her, and she was self-evidently engaged

in trying to understand why.  Indeed, as she said, she was trying to determine whether *he* had been lying to her.

In United States v. Vazquez, the court of appeals considered a somewhat similar situation.  857 F.2d 857 (1st Cir. 1988). That case, which pre-dates Crawford, analyzed the admission of a statement made by one defendant to another in the presence of Customs officials.  Both men had been stopped in Puerto Rico after arriving on a flight from Venezuela.  They had given inconsistent answers to a number of questions, including whether they knew each other.  Id. at 859.  Customs inspectors discovered cocaine strapped to one man (Pizarro), then, about five minutes later, brought the other (Vazquez) into the same room where Pizarro was waiting.  Id.  Immediately upon entering the room, Vazquez said to Pizarro, "Listen, why you say you know me? I don't know you.  I don't know you.  I never seen you before." Id.  Pizarro (apparently unimpressed with his friend's loyalty) responded, "'No me joda.'[3]  You know me.  Now I'm going to get all the blame and you guys are going to get out."  Id.

After determining that the situation had not amounted to an "interrogation" for Miranda purposes, id. at 860-64, the court went on to consider whether the statements were excited utterances.  Without much fanfare, it concluded that they were.

---

[3] According to co-counsel, this phrase might be loosely translated as a crude version of "don't mess with me."

"[A]fter Vazquez reproached him, Pizarro 'got mad at that moment' and lashed out at Vazquez.  Given the circumstances of the abrupt encounter, Pizarro's spontaneous statement had sufficiently substantial guarantees of trustworthiness to allow its admission as an exception to the hearsay rule."  Id. at 864.  "Indeed," the court went on, "if Vazquez had *not* been part of the plan to import, little purpose would be served in Pizarro accusing him of such; there would be no reason for Pizarro to implicate his 'friend' *unless* he felt that he was being hung out to dry."  Id. (emphasis in original).

The circumstances of Mrs. Griffin's statements are similar. She "got mad at the moment" and "lashed out" at Griffin, demanding an explanation for his sudden arrest and for the presence of police officers in her home.  She accused him, as Pizarro accused Vazquez, of bringing the situation on them ( "You said you were done with this").  Her statements reflect shock, anger, and a need to find answers from her husband.  They are the type of statement that has traditionally been considered and "excited utterance."

**2.    The nature of Mrs. Griffin's statements was not "testimonial"; Crawford is no bar to their admission.**

For the reasons explained above, the statements, while made in the presence of police officers, are not "testimonial" as Crawford explains the term.  Like a 911 caller, Mrs. Griffin was aware of a police presence; like a 911 caller, she was agitated

10

and upset.  These similarities point toward a conclusion that the statements were not "testimonial."  See Brito, 427 F.2d at 63 ("Ordinarily, statements made to police while the declarant or others are still in personal danger cannot be said to have been made with consideration of their legal ramifications.  Such a declarant usually speaks out of urgency and a desire to obtain a prompt response.  It follows, therefore, that such statements will not normally be deemed testimonial." [citation omitted]).

In other ways, however, the statements were not at all like a 911 call.  For example, Mrs. Griffin was not communicating with the police, but rather with her husband.  "I didn't really care what they [the police officers] were saying.  I wanted to hear what [Griffin] was saying because at that point I had no idea." [3/27/06 Tr.38].  Rather than being the intended audience for her statements, the police were a hindrance to her information-gathering.  Under the circumstances, is it reasonable to believe that Mrs. Griffin (or another person in her situation) was considering the "legal ramifications" of her statements?  If she had been, perhaps she would not have said the things she said.  Perhaps she would have kept her counsel while the police were present, and waited for a private moment to confront her husband.  Like those prompting the 911 caller in Brito, "the circumstances that made the [statement] an excited utterance were significant enough to overwhelm the [speaker's] capacity to appreciate the

11

potential long-term use of her words." <u>Id</u>. at 63-64.  Mrs.

Griffin was sufficiently overcome by the events that prompted her

statement to forget herself, for a few minutes, and to ask

unguarded, direct questions of Griffin, which the police

overheard.  These statements were not "testimonial" and should be

admitted.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Rachel E. Hershfang
      Rachel E. Hershfang
      Nathaniel R. Mendell
      Assistant U.S. Attorneys
      (617)748-3249/-3304

January 24, 2007

## Certificate of Service

    I hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing (NEF) and mailed
to all those not participating in ECF.

/s/ Rachel E. Hershfang
Rachel E. Hershfang
